**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GALE CLAPPER,

        Plaintiff,

    v.

UNITED AIRLINES, INC.,

        Defendant.

No. 20 CV 2635

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiff Gale Clapper worked as a flight attendant for defendant United Airlines, Inc. Clapper scheduled hip-replacement surgery and, around the same time, failed to return a passenger's lost property. The airline fired her. Clapper alleges that United discriminated against her on the basis of age and disability and interfered with her benefits, violating the Americans With Disabilities Act, Age Discrimination in Employment Act, and the Employee Retirement Income Security Act. United moves for summary judgment. For the reasons discussed below, the motion is granted.

## I. Legal Standard

A party moving for summary judgment must show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I construe all facts

and draw all reasonable inferences in favor of Clapper, the nonmoving party. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020). United bears the burden of establishing that the summary judgment standard is met, but Clapper must put forward enough evidence to establish every element of her claims and show that she can carry her burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Background

Gale Clapper worked as a flight attendant for United Airlines for thirteen years, beginning in January 2006. [83] ¶¶ 2, 17;[1] [89] ¶ 1.[2] Clapper was based out of O'Hare International Airport, and during the course of her employment received

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Clapper's response to United's Local Rule 56.1 statement, [83], and United's response to Clapper's statement of additional facts, [89], where both the asserted fact and the opposing party's response are set forth in one document. I ignore statements of fact that are unsupported by specific evidentiary material. *See* N.D. Ill. Local R. 56.1(d)(2). Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *see Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *see, e.g.*, [83] ¶¶ 3, 26, 40, 47, 67, 75; [89] ¶¶ 1, 14. I disregard legal arguments in the statements of facts, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006); N.D. Ill. Local R. 56.1(d)(4), and ignore additional facts included in response that do not controvert the asserted fact. N.D. Ill. Local R. 56.1(e)(2); *see, e.g.*, [83] ¶¶ 3, 16, 19, 22, 26–27, 30, 33–34, 45, 59, 61–62, 70, 78–79.

[2] Defendant's general objection to plaintiff's compound facts is overruled. While plaintiff's Rule 56.1 statements include more than one fact, *see* [89], for the most part they relate to the same subject or topic and are not so excessive as to violate the local rule. United repeatedly objects to plaintiff's statements based on N.D. Ill. Local R. 56.1(d)(2), arguing that plaintiff should have cited specific evidence after each fact asserted. But Clapper cites to specific evidence at the end of most of her statements of fact, and facts that are adequately supported by that material comply with the rule. I ignore the facts that Clapper hasn't adequately supported. When necessary, I considered portions of Clapper's deposition that substantiate her account of what happened. *See* [82-2]; Fed. R. Civ. P. 56(c)(3).

positive performance evaluations and reviews from customers. [89] ¶ 1.[3] In 2019, when Clapper was sixty-six years old, she reported to United's O'Hare base supervisor, Rosalyn Bishop. *See* [83] ¶¶ 17–18.

Clapper was a member of the Association of Flight Attendants union, and her employment was governed by a collective bargaining agreement. [83] ¶ 9; *see* [82-6]. The CBA included rules about rates of pay, and outlined investigation and appeal processes for flight attendant discipline and termination. [83] ¶¶ 10–11. According to the CBA, a flight attendant would not normally be disciplined more than thirty days from the time when management learned about an incident. *Id.* ¶ 11. But that thirty-day period could have been extended if a flight attendant asked to postpone an investigatory meeting during the thirty-day period. *See* [89] ¶ 27; [82-6] at 194.

United policies—which Clapper received and understood—required employees to be honest, professional, and responsible. [83] ¶¶ 3–8. The company also prohibited discrimination on the basis of protected categories, including age and disability. *Id.* ¶ 3.[4] Because supervisors weren't on aircraft, United relied on its flight attendants

---

[3] United moves to strike Clapper's declaration, maintaining that it contains conclusory allegations unsupported by specific facts, statements made without personal knowledge, hearsay, and statements which contradict earlier sworn testimony. [87] at 1. Affidavits used to oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible, and show that the declarant is competent to testify on the matters at issue. Fed. R. Civ. P. 56(c)(4). Plaintiff had personal knowledge of the performance evaluations and customer reviews she received while working for United. *See* [89] ¶ 1; [82-1] ¶ 23. United's motion to strike is overbroad and denied. While portions of the declaration lack foundation, *see, e.g.*, [82-1] ¶¶ 3, 5, 11, other parts are adequately grounded in Clapper's personal knowledge, *see, e.g., id.* ¶¶ 10, 12, and I decline to strike the entire declaration. I address defendant's objections to the declaration as they arise when discussing the facts.

[4] The cited portion of Clapper's declaration—Clapper said that employees were fearful to report medical issues because United wanted to hire younger, cheaper employees—doesn't controvert the asserted fact about United's policies. *See* [82-1] ¶ 3. Because Clapper didn't

to perform their in-flight duties largely without supervision, and trusted them with company property. *Id.* ¶ 19.

### A. Clapper's Hip Problem and United's Benefits

United offered eligible employees a healthcare program called Center of Excellence. [83] ¶ 12. Participating employees were required to pay a deductible, and United would then pay for certain surgical procedures. *Id.* In 2019, United expanded the program, partnering with medical providers in major cities in the United States. *Id.* ¶ 16. One of the participating health-care providers was Rush University Medical Center in Chicago, which offered hip-replacement surgery. *Id.* ¶ 13.

Clapper began having hip trouble after a work-related injury in 2014. [83] ¶ 61. She walked with a noticeable limp in 2018 and was seen limping by a co-worker, *id.* ¶ 62; *see* [82-2] at 246–49, but didn't go to a doctor for chronic hip pain until 2019. [83] ¶ 61. On April 22 and 25, United received letters from Clapper's doctor that said she needed to be off work from April to August due to right hip arthritis, pain, and a related hip-replacement surgery scheduled for June 14. [83] ¶ 63. United approved the request for leave and the surgery. *See* [89] ¶ 29; [83] ¶ 63; [82-2] at 29–30, 74–75.[5]

---

explain how she knew what other employees thought, who those employees were, or establish any basis for her knowledge of United's intentions, this portion of Clapper's declaration also lacks foundation. *See* Fed. R. Evid. 602.

[5] Clapper asserts that United had the discretion to extend her medical leave before making a disciplinary decision. *See* [89] ¶ 2. But neither plaintiff's deposition, [82-2] at 39, nor the cited record, *see* [82-5] at 2, support that proposition. The record—which appears to be from Clapper's HR file—also hasn't been properly authenticated. *See Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 777 (7th Cir. 2006); Fed. R. Evid. 803, 902.

### B. Misconduct, Surgery, and Termination

On April 2, 2019, Clapper worked a flight from Boston to Chicago. [83] ¶ 20. After the passengers disembarked, a cabin cleaner found an iPad left behind by a passenger. *Id.* ¶ 20; *see* [89] ¶ 6. The cleaner handed it to Clapper, who placed the iPad on a counter in the first-class galley. [83] ¶ 20; [89] ¶ 6; *see* [82-2] at 21–22, 144–45, 262.[6] The other flight attendants exited before Clapper, and she took the iPad off the aircraft. [83] ¶ 20; *see* [89] ¶ 6. According to Clapper, another flight attendant—the purser—should have taken responsibility for the customer's lost property. *See* [89] ¶¶ 24, 31; [82-1] ¶ 7; [82-2] at 141.[7]

United flight attendants were supposed to give lost customer property to a customer service representative, [83] ¶¶ 6–7, 23, but after hours there often wasn't a customer service representative on duty. *See* [89] ¶ 24; [82-2] at 129. Clapper spoke to a customer service representative at the gate but didn't give the iPad to that person. [83] ¶¶ 21–22. Instead, Clapper tried to catch up to the purser who had been aboard the aircraft, intending to turn the iPad over to him. [83] ¶ 24. When Clapper couldn't catch up with the purser, she attempted and failed to find the customer

---

[6] Clapper's deposition testimony was that the cleaner handed her the iPad, and doesn't show that the cleaner handed the iPad to the flight attendants as a group. *See* [82-2] at 145, 262.

[7] Standard protocol on United flights was that the purser would take charge of lost customer items. [89] ¶ 23; *see* [82-2] at 141, 144–45; [82-1] ¶¶ 6–7. It's reasonable to infer that Clapper had personal knowledge of the practice for flight attendants (including the purser) and lost property on United aircraft. *See* Fed. R. Evid. 602. Clapper's deposition testimony and declaration that the purser was responsible for lost items are evidence about the practice on United flights, and aren't impermissible legal argument.

5

service representative at the gate a second time. [83] ¶ 24; *see* [89] ¶¶ 6, 21.[8] Plaintiff didn't check to see if United's administrative office was open, and took the iPad to her home in Wisconsin. [83] ¶¶ 25–27; [89] ¶ 7.[9]

Clapper brought the iPad into her home and kept it there for the next two weeks. [83] ¶¶ 27, 29. While Clapper intended to either return the iPad to the airport on her next flight or have an Apple store trace the owner, *see* [89] ¶ 7; [82-2] at 151, she didn't do either of those things. [83] ¶¶ 31–32. Clapper also didn't contact United's office or her supervisor about the customer's property. *Id.* ¶ 30. Clapper forgot about the iPad because she was flying for much of the next two weeks, dealing with a flood in her basement, and preparing for surgery. *See* [89] ¶¶ 8–11; [82-2] at 33.

The iPad's owner filed a lost-and-found claim with United. [83] ¶ 33. The customer also traced the iPad's location to Clapper's home, and contacted law enforcement in Wisconsin asking them to retrieve the device. *Id.* ¶ 34; [89] ¶ 15. The customer told United where his iPad was,[10] and United security connected Clapper

---

[8] Clapper had personal knowledge of her attempts to turn in the iPad, and her declaration provides adequate support for this statement of fact. *See* Fed. R. Evid. 602; [82-1] ¶ 7.

[9] There were "left-on-board" boxes in the terminal at O'Hare where Clapper could have left the iPad, including near the gate where her flight had landed. [83] ¶ 28. But Clapper didn't know about the "left-on-board" boxes and they weren't mentioned in any United manuals or policies that Clapper read. *See* [82-1] ¶ 9; [82-2] at 129. Customer service representatives could be found at locations throughout the airport. [83] ¶ 28. Facts about what Clapper did with the iPad are relevant to the circumstances of her termination. *See* Fed. R. Evid. 401; [89] ¶¶ 7–11.

[10] The customer's statement to United's security personnel isn't hearsay because it's offered to show what United's personnel believed about Clapper's conduct, not to prove that the iPad was actually at Clapper's house. *See* Fed. R. Evid. 802; *United States v. Law*, 990 F.3d 1058, 1062 (7th Cir. 2021) (citation omitted).

to the address in question. [89] ¶¶ 15–16. Rather than reaching out to Clapper directly, United security told the customer to contact law enforcement. [83] ¶¶ 35–37; [89] ¶¶ 15–16.

On April 16, 2019, a police officer called Clapper asking if she knew where the iPad was. [83] ¶ 37; *see* [89] ¶ 12. Clapper told the officer that she had the iPad in her possession, [83] ¶ 37; *see* [89] ¶ 12, and then called United about the lost property. [83] ¶ 38. Clapper drove to O'Hare and turned the iPad in to Rachel Telson, a human resource manager. *Id.* ¶ 39. Telson told Clapper that she would be placed on paid leave pending a hearing. *Id.* ¶ 40; *see* [82-2] at 57–59.[11] Clapper told Telson that she had medical appointments coming up, and Telson replied that Clapper should keep her appointments. [89] ¶ 14; [82-2] at 39–40. Telson also told Clapper that she could rely on Medicare regardless of what happened with United's disciplinary proceeding. *See* [89] ¶ 14; [82-2] at 39–40, 234–35.[12]

United issued Clapper a letter of investigation and (after a schedule change) the investigatory meeting was held on May 6. *See* [83] ¶¶ 42–45.[13] Consistent with

---

[11] Telson didn't supervise Clapper, but there's a dispute as to whether she had input into Clapper's subsequent termination. *See* [83] ¶ 41; [89] ¶ 30; [82-4] at 38 (Bishop said she talked with Telson about Clapper's case.); [76-6] at 61–62 (Telson said she didn't have input into the decision to terminate Clapper.).

[12] Clapper said that she couldn't remember precisely what Telson said, but that the bottom line was that Clapper didn't need to worry because Medicare would cover her medical costs. *See* [82-2] at 234–35. Defendant attempts to controvert the asserted fact by citing to a portion of Telson's deposition transcript, *see* [89] ¶ 14, but that portion of the transcript hasn't been filed on the record by either party. *See* [76-6] at 3–4 (defendant filed two pages of Telson's deposition transcript, but not the pages cited). Clapper's asserted fact is admitted.

[13] There's a dispute as to why the meeting was rescheduled. *See* [83] ¶ 43. A letter from Bishop to Clapper showed that Bishop rescheduled the meeting at plaintiff's request, *see* [76-1] at

the advice of Clapper's doctors, United arranged for a van to transport Clapper to the meeting. [89] ¶ 20. During the meeting, a senior investigator in United's corporate security department interviewed Clapper, who attended with a union representative, submitted two written statements, and read a statement. [83] ¶ 45; [89] ¶ 22. Clapper told the investigator that she had removed the iPad from the plane and taken it home, didn't tell anyone at United that she had the iPad, and only returned the device after law enforcement contacted her. [83] ¶ 46. Clapper also told the investigator that she had forgotten about the iPad until she was contacted by Wisconsin police. *Id.* ¶ 48. Plaintiff's written statements asserted that there was no customer service representative at the gate when she left the aircraft, but security footage showed that there was a representative at the gate and that she had a brief conversation with the representative. *Id.* ¶ 47. Plaintiff's surgery and hip problems came up during the meeting. *See* [83] ¶ 75; [82-2] at 153–55.

On May 7, United's investigator issued written findings, concluding that Clapper violated company policy. [83] ¶ 49. After reviewing those findings, Clapper's supervisor, Rosalyn Bishop, decided to fire Clapper. *Id.* ¶ 50. Bishop concluded that Clapper had deprived the customer of his property, violated United's policies about lost items, professionalism, responsibility, and honesty, and that termination was warranted due to the egregious nature of Clapper's misconduct. *Id.* ¶ 51.

---

76, but Clapper said that she never had a conflict with the original date and that the meeting was moved to accommodate United. [82-1] ¶ 13.

Bishop prepared a separation letter for plaintiff dated May 13, and reached a decision to fire Clapper on that date so as to comply with the flight attendants' CBA. [83] ¶ 52. There's a dispute as to when Bishop learned about Clapper's pending surgery. Bishop said she didn't know about the operation until after Bishop made the decision to fire Clapper (May 13). *See* [83] ¶ 54. But Clapper discussed her surgery during the May 6 meeting, in written statements prepared for that meeting, and with Bishop during a phone call on May 13, *see id.* ¶ 75; [82-1] ¶ 15; [82-2] at 160–61, and it's reasonable to infer that Bishop knew about Clapper's hip surgery before deciding to terminate plaintiff's employment.[14]

Bishop notified Clapper's union of the termination decision on May 13. [83] ¶ 53. The union asked Bishop for more time so that plaintiff could continue benefits that would cover a hip replacement surgery. *Id.* There's a dispute whether United offered Clapper the chance to retire, rather than be fired. Plaintiff said that such an offer was made to her from United through her union representative, and that Bishop mentioned the offer in a phone call. *See* [89] ¶ 26. According to Bishop, however, neither she nor the company offered retirement to Clapper. *See* [82-4] at 235–36. On May 20, Bishop issued a termination letter to Clapper. [83] ¶ 56.

Two days later, Clapper received a COBRA notice. [83] ¶ 15. United flight attendants who were terminated or retired were still eligible for Center of Excellence

---

[14] Plaintiff had personal knowledge of what she told Bishop in a phone call on May 13, and what she wrote in her statements submitted at the May 6 meeting (all offered not for the truth of matters asserted but to establish notice of Clapper's surgery to Bishop). *See* [82-1] ¶ 15; Fed. R. Evid. 602. By describing the circumstances surrounding her written statements and the subsequent call with Bishop, Clapper adequately laid a foundation for this part of her declaration. *See* [82-2] at 153–55, 160–2, 246.

procedures, as long as they opted for COBRA continuation coverage. *Id.* ¶ 14.[15] After being fired, Clapper sought supplemental Medicare coverage just before her surgery to ensure that the procedure would be covered. *See* [89] ¶ 28;[16] [82-2] at 71. Plaintiff rescheduled her hip surgery to May 31, and received surgery on that day, paid for by United. [83] ¶¶ 64–65, 78.

Clapper appealed her termination decision using the grievance process outlined in the CBA. [83] ¶¶ 57–60. After an initial hearing, United's base manager upheld Bishop's decision. *Id.* ¶¶ 57, 74. After a second appeal hearing, the decision was again upheld. *Id.* ¶ 58. Clapper's union appealed her termination to a board of adjustment, but the union chose to drop the case and Clapper declined to proceed on her own before the adjustment board. *Id.* ¶ 59.

According to Bishop and United's director of labor relations, no other flight attendants who reported to Bishop engaged in conduct similar to Clapper's. [83] ¶ 66. Plaintiff couldn't identify any other United employees who had taken the property of a customer and failed to return it and whose employment wasn't terminated. *Id.* ¶¶ 67, 70, 73.

Clapper submitted an inquiry form to the EEOC in October 2019. [83] ¶ 76. Clapper alleged age discrimination, but (under the impression that disability didn't

---

[15] Clapper's declaration says that she was told by United benefits personnel that she would lose her eligibility for surgery if she was fired or retired. [82-1] ¶ 4. But Clapper hasn't offered any specific facts supporting this assertion, such as who she talked to or when the conversation occurred. This portion of the declaration lacks foundation and cannot be used to controvert defendant's fact.

[16] Clapper's deposition (cited by plaintiff) doesn't show that she needed to be on Medicare to have her procedure covered. *See* [89] ¶ 28; [82-2] at 71, 252.

include her hip problem) wrote that she wasn't disabled. *Id.* ¶ 76; *see* [82-1] ¶ 20. Plaintiff later said that, until EEOC corrected her understanding about eligible disabilities, *see* [82-1] ¶ 20,[17] she didn't see herself as disabled or believe that she was fired because of her disability. [83] ¶ 76.[18]

## III.  Analysis

### A.  Age and Disability Discrimination

Clapper argues that United discriminated on the basis of her disability and age when it terminated her employment. [81] at 6–7.[19] To prove her claims, Clapper must show that United fired her because of age or disability. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Because the parties concentrate on the *McDonnell Douglas* framework, I begin by asking whether plaintiff has alleged a prima facie case of discrimination. *See Igasaki v. Illinois Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021).

The analyses under the ADA and ADEA are similar, and Clapper's discrimination claims can be evaluated together. *See Brooks v. Avancez*, 39 F.4th 424,

---

[17] What the EEOC officials told Clapper is being offered for its effect on Clapper, and isn't hearsay. *See* Fed. R. Evid. 802; *United States v. Law*, 990 F.3d 1058, 1062 (7th Cir. 2021) (citation omitted).

[18] Clapper testified that her disability was that she needed to have hip surgery to correct a problem. [83] ¶ 71. She said that she was aware of one other flight attendant who used the Center of Excellence program and for whom United paid for a surgery, and wasn't aware of anyone who attempted to use the Center of Excellence Program but was denied. *Id.* ¶¶ 79–80. At her deposition, Clapper also said she was fired because of how much money she was making at United given her experience. *Id.* ¶ 69.

[19] Plaintiff concedes that her claims for age and disability discrimination aren't actionable under Title VII. [81] at 7; *see* 42 U.S.C. § 2000e-2(a)(1); *Hall v. City of Chicago*, 713 F.3d 325, 330 (7th Cir. 2013). The motion for summary judgment is granted as to the Title VII claims.

433 (7th Cir. 2022). Under the ADA, an employer discriminates when it takes an adverse action against an employee because of the employee's disability. 42 U.S.C. § 12112; *see Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013). The ADEA protects workers forty years old and older from discrimination based on their age. *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020).

The *McDonnell Douglas* framework for plaintiff's claims is the same. Clapper can make a prima facie case of discrimination if she can show (1) that she is disabled under the ADA or protected under the ADEA, (2) she performed her job to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) one or more similarly situated individuals outside her protected class received better treatment. *Tyburski*, 964 F.3d at 598 (ADEA); *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 685 (7th Cir. 2014) (ADA). Clapper's termination was an adverse action. If Clapper makes the required showing as to the other three elements, United must produce evidence that it acted based on a legitimate and nondiscriminatory reason, which can be rebutted if Clapper shows that defendant's stated reason was pretextual. *Brooks*, 39 F.4th at 434 (citations omitted).

### 1. Protected Under the ADA and ADEA

The parties agree that Clapper—who was sixty-six years old when she was fired—was protected from discrimination under the ADEA. *See* [83] ¶¶ 17, 56; *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018) (quoting 29 U.S.C. § 623(a)(1)). Clapper was disabled under the ADA if she had (1) a physical or mental impairment that substantially limited one or more major life activities; (2) a record

of such impairment; or (3) was regarded as having such an impairment. *See* 42 U.S.C. § 12102(1); *Carothers v. Cnty. of Cook*, 808 F.3d 1140, 1147 (7th Cir. 2015).

Clapper argues that her hip problems substantially limited her ability to walk. [81] at 10–12; *see* 42 U.S.C. § 12102(2)(A) (walking is a major life activity). A limitation on the ability to walk can be disabling, but only if the limitation is "permanent or long term, and considerable compared to the walking most people do in their daily lives." *Fredricksen v. United Parcel Serv., Co.*, 581 F.3d 516, 522 (7th Cir. 2009) (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005)). Claims that someone walks with difficulty without medical corroboration or evidence as to time or distance limitations aren't enough, and neither is evidence of a temporary impairment. *Id.* (discussing *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 784–85 (7th Cir. 2007) and *Scheerer v. Potter*, 443 F.3d 916, 920 (7th Cir. 2006)).

Clapper's hip problems impaired her ability to walk to some degree. *See* [83] ¶¶ 61–63; [82-1] ¶¶ 17–18. The trouble began in 2014 after an injury, and Clapper walked with a limp as of 2018. *See* [83] ¶¶ 61–62. Clapper was able to drive herself to and from work in April 2019, *see id.* ¶¶ 27, 32, 39, but her doctors told her that she shouldn't drive as of May 6 (when United arranged for a van to bring Clapper to the investigatory meeting). *See* [89] ¶ 20; [82-2] at 160. Clapper didn't see a doctor about her hip problem until 2019, [83] ¶ 61, and in April of that year her doctor found that she needed to take a four-month medical leave due to right hip arthritis, pain, and related hip-replacement surgery. *Id.* ¶ 63. Clapper sought treatment for the problem

13

because she was having pain and discomfort in the area, but she continued to work as a flight attendant in the leadup to her surgery. *See* [82-2] at 30–31; [83] ¶ 2.

This record shows no more than a moderate limitation in Clapper's ability to walk. *See Fredricksen*, 581 F.3d at 522. Walking with a limp isn't enough to show a disability, *see Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 951 (7th Cir. 2000) (quoting *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999)), and plaintiff's diagnoses of hip arthritis and pain aren't sufficient, either. *See Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 642–43 (7th Cir. 2005) (citations omitted). Clapper's case isn't like *Sears, Roebuck & Co.* (cited by plaintiff), because the evidence in that case showed that an employee was unable to go a city block without walking becoming nearly impossible, had to hang on to walls for support, and the impairment worsened significantly over time. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005). Here, by contrast, plaintiff hasn't presented any evidence about the distances she was able to walk, as of 2019 her condition wasn't preventing her from working as a flight attendant, and there's only one instance of Clapper requiring assistance getting around (being driven to the investigatory meeting). Clapper hasn't shown that her problem caused a substantial limitation in her ability to walk, and failed to show that she was disabled under the ADA. *See Fredricksen*, 581 F.3d at 522; *Moore*, 221 F.3d at 951–52.

### 2. Clapper's Performance

The second element of Clapper's discrimination claims requires her to show that she was performing well enough to meet United's legitimate expectations at the

time of her termination. *See Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 599–600 (7th Cir. 2010) (ADEA); *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1127–28 (7th Cir. 2006) (ADA). It's undisputed that Clapper violated United's policies for employee conduct by failing to return customer property. *See* [83] ¶¶ 6–7, 23.

Clapper cites her past, successful performance for United. *See* [81] at 9, 12. But even assuming the truth of her positive reviews, Clapper's previous successes don't show that she was meeting United's expectations in April 2019, which is the period that matters here. *See Timmons*, 469 F.3d at 1128, *Naik*, 627 F.3d at 600. Alternatively, Clapper contends that she doesn't need to prove that she was meeting expectations because she was singled out for discipline and the person judging her performance—Bishop—is the same person accused of discriminating against her. *See* [81] at 9, 12–13 (citing *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 612 n.3 (7th Cir. 2001) and *Curry v. Menard, Inc.*, 270 F.3d 473, 477–78 (7th Cir. 2001)). Because United claims to have fired Clapper for failing to meet its legitimate expectations, *see below* at 17–18, plaintiff is right that the questions of pretext and employer expectations overlap in her case. *See Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022); *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 n.8 (7th Cir. 2008). Clapper wasn't meeting expectations if she failed to follow company rules, which would be a non-discriminatory reason for termination. *See Brooks*, 39 F.4th at 435 (citing *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478 (7th Cir. 2010)). But if United's reliance on its policies and Clapper's violation of them was a disingenuous coverup for

discrimination, it could be liable even if Clapper broke the rules. The issue becomes one of pretext, discussed below.

###        3.        *Similarly Situated Individuals*

Clapper argues that another flight attendant—the purser on the April 2 flight—is a similarly situated individual, because he neglected his duties on that day but wasn't disciplined in relation to the customer's missing property. *See* [81] at 9, 13. But Clapper hasn't shown that the purser is a good point of comparison. For one thing, it's not clear that the purser wasn't a member of Clapper's protected classes, because the facts don't show that he wasn't disabled or older than forty. *See* [89] ¶¶ 6, 23, 31; [83] ¶ 24; *Brooks v. Avancez*, 39 F.4th 424, 434 (7th Cir. 2022) (a prima facie case requires a showing that one or more similarly situated individuals *outside* plaintiff's protected classes received better treatment).

Clapper also hasn't alleged that the purser was comparable to her in the ways that matter. While similarly situated employees don't need to be identical in every way, they must be directly comparable in all material respects. *See Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021). The requirement of similarity is intended to eliminate variables other than discriminatory animus that might explain differential treatment, and usual factors of comparison are (1) whether comparators dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct. *Coleman v. Donahoe*, 667 F.3d 835, 846–47 (7th Cir. 2012). In this case, the purser may have been subject to similar standards, *see* [83] ¶¶ 3–4, 6–7, but Clapper hasn't shown that her colleague worked

16

under the same supervisor as she did. Plaintiff argues that the purser neglected his duty to manage the aircraft's contents, *see* [81] at 13, but even if the purser failed in that way, his misconduct wouldn't have been comparable to Clapper's because she took customer property home and failed to alert the company or customer.

Clapper hasn't shown that she and the purser were comparable in all material respects, and hasn't carried her burden as to this element of the prima facie case of discrimination. Construing the facts and reasonable inferences in favor of Clapper, she hasn't shown that she was disabled under the ADA, met United's legitimate expectations, or that similarly situated individuals outside her class were better treated. Under both the ADA and ADEA, Clapper hasn't demonstrated that she can carry her burden of proof at trial.

### 4. *Pretext and Totality of the Evidence*

Even if Clapper had alleged a prima facie case of age or disability discrimination, her claims wouldn't survive summary judgment under the *McDonnell Douglas* approach because United had a legitimate reason to fire her, one that Clapper hasn't discredited. To show that United's reason is pretextual, Clapper needs to prove that United is lying, and that the real reason for her termination was discrimination. *Marnocha v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 986 F.3d 711, 721 (7th Cir. 2021) (ADEA); *Hooper v. Proctor Health Care, Inc.*, 804 F.3d 846, 854 (7th Cir. 2015) (ADA). The question isn't the validity, reasonableness, or fairness of the company's decision, but rather the honesty of United's explanation. *See Brooks v. Avancez*, 39 F.4th 424, 435–36 (7th Cir. 2022).

17

There's no dispute that Clapper was required to hand over customer property retrieved on aircraft to a customer service representative, [83] ¶¶ 6–7, that Clapper failed to do so, and that she brought the customer's iPad to her home and forgot about it for two weeks. *See id.* ¶¶ 21–22, 27, 29–32. United's internal investigation concluded that Clapper had violated the company's guidelines, and Clapper's supervisor, Bishop, fired plaintiff after reviewing the investigation's findings because Clapper had deprived a customer of his property and failed to follow company guidelines. *See id.* ¶¶ 49–52, 56.

United has met its burden by showing a non-discriminatory reason for the termination: that the company believed Clapper had taken customer property and failed to return it. In an attempt to show pretext, plaintiff argues that (1) Bishop knew of Clapper's age and disability, (2) an HR employee—Telson—told Clapper that she could pursue her surgery using Medicare, (3) the company failed to extend the disciplinary period, as permitted under the CBA, to accommodate Clapper's surgery, (4) the company terminated Clapper outside the thirty-day period under the CBA, (5) a screenshot of Clapper returning to the gate in search of a customer service representative was overlooked during the investigatory meeting, and (6) the flight's purser wasn't disciplined for the incident. *See* [81] at 6–7, 9. None of these arguments show that United's stated reason was a lie.

Given her supervisory role, it's reasonable to infer that Bishop knew how old Clapper was at the time she was fired. *See* [83] ¶ 18. Clapper wasn't disabled under the ADA (as discussed above), and so Bishop couldn't have known that Clapper was

disabled in 2019. *See Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("[A]n employer cannot be liable under the ADA for firing an employee when it indisputably had no knowledge of the disability."). Even if Bishop had known that Clapper was protected under both the ADA and the ADEA, however, that knowledge isn't itself evidence of pretext or discrimination.

Telson—who didn't supervise Clapper but had some input into Bishop's decision to fire her—told Clapper that she could rely on Medicare to cover her surgery regardless of what happened with United's disciplinary proceeding. *See* [89] ¶¶ 14, 30; [82-2] at 39–40, 234; [83] ¶ 41; [82-4] at 38. The comment isn't evidence of discrimination, because acknowledging that Clapper may have been eligible for Medicare coverage doesn't convey any discriminatory animus.[20] Even if what Telson said had been discriminatory, an isolated comment isn't evidence of discrimination unless it is contemporaneous with the discharge or causally related to the discharge decision-making process. *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012). Telson referenced Medicare on April 16, 2019, *see* [89] ¶ 14; [83] ¶¶ 39–41, and there's no evidence that the remark factored into Bishop's decision to fire Clapper a month later. *See* [83] ¶¶ 50–56.

Citing the flight attendants' CBA, plaintiff argues both that United fired her too soon and too late, but the facts say otherwise. United wasn't required to give Clapper more time under the agreement, because an extension of the disciplinary

---

[20] Similarly, that Bishop may have conveyed an offer for Clapper to retire without benefits, *see* [89] ¶ 26, isn't evidence of discrimination, because the offer doesn't suggest discrimination on the basis of age or disability.

period was left to the company's discretion. *See* [89] ¶ 27; [82-6] at 194. Plaintiff appears to argue that the company needed to take disciplinary action within thirty days of the alleged misconduct, but the CBA said that the disciplinary clock started from the time that "Inflight Management" learned of the misconduct by a flight attendant, *see* [89] ¶ 27; [82-6] at 194; [76-5] at 20 (United security learned about the incident on April 12), and United may have given Clapper the requested extension, since she wasn't fired until May 20, after the meeting date had been moved. *See* [83] ¶¶ 43, 56. Whether United actually violated the terms of the CBA isn't at issue here, and nothing about the timing of United's disciplinary process gives rise to an inference of discrimination.

Clapper's last argument for pretext is a comparison with the purser. *See* [81] at 9.[21] As discussed above, however, plaintiff hasn't shown that the purser was similarly situated to her because the two didn't engage in similar conduct, and it's also not clear that the purser didn't belong to Clapper's protected categories. Clapper's comparator evidence doesn't cast doubt on defendant's reasoning.

Under the *McDonnell Douglas* approach, summary judgment for United is appropriate because Clapper can't establish every element of her age and disability discrimination claims or show that United's stated, legitimate reason for firing her was a pretext. Setting aside the burden-shifting framework, the outcome is the same.

---

[21] Clapper also argues that during the May 6 investigatory meeting, United's representatives failed to show a relevant portion of security footage—showing that she returned to the gate in search of a customer service representative but couldn't find one. *See* [81] at 7. The facts don't support this version of events. *See* [89] ¶ 21; [82-1] ¶ 7; *see also* [76-5] at 21 (United's statement of findings, prepared after the meeting, acknowledges that security footage shows Clapper returning to the gate.).

Considering all of the evidence, *see Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016), no reasonable factfinder would conclude that plaintiff's age or disability caused United to fire her. Plaintiff has shown that she suffered an adverse action. But the record shows only one reason why United took that action: Clapper took customer property home and lost track of it, violating the company's rules. Under both the ADA and the ADEA, that doesn't add up to discrimination.[22]

## B.   ERISA Interference

Under ERISA's § 510, United was prohibited from discharging or discriminating against a participant in an employee benefits plan "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. A § 510 discrimination claim requires Clapper to prove that United acted with the specific intent to interfere with her benefits. *See Nauman v. Abbott Labs.*, 669 F.3d 854, 857 (7th Cir. 2012) (citation omitted). In other words, actions that only incidentally affected Clapper's benefits under a plan do not violate ERISA. *See Teamsters Loc. Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 826 (7th Cir. 2014) (citing *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 796 (7th Cir. 2005)).

---

[22] Under either law, Clapper must link her firing with her protected characteristic—age or disability. *See Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020) (ADA); *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (ADEA). The parties don't distinguish between the causation standards under the ADEA and ADA, but (in light of the ADA Amendments of 2008) it remains an open question whether the but-for rule from the ADEA context is the same under the ADA. *See Kurtzhals*, 969 F.3d at 728. Because neither party raised the issue, I apply the but-for standard to both of plaintiff's claims. *See id.*; *see also Brooks v. Avancez*, 39 F.4th 424, 440 n.11 (7th Cir. 2022) (noting the continuing ambiguity about the ADA standard but assuming that the causation analysis under the ADA and ADEA remains the same).

Clapper also relies on the *McDonnell Douglas* approach to prove her ERISA claim. *See* [81] at 13–15; *Isbell,* 418 F.3d at 796. To establish a prima facie case of a § 510 violation, Clapper must show (1) that she belonged to the protected class, (2) was qualified for her position, and (3) was discharged under circumstances that provide some basis for believing that United intended to prevent Clapper from using her benefits. *Id.*; *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 668 (7th Cir. 2008). When a defendant advances a legitimate, nondiscriminatory reason for its action, however, there's no need to decide whether a plaintiff has established a prima facie case under § 510. *Isbell,* 418 F.3d at 796 (citing *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998)); *Grottkau v. Sky Climber, Inc.*, 79 F.3d 70, 73 (7th Cir. 1996).

As discussed above, United has advanced a legitimate, nondiscriminatory reason for firing Clapper. Clapper remained eligible for the health-care program at issue even after being fired, *see* [83] ¶ 14, and there's no evidence that the company intended to deprive Clapper of benefits. *See Lindemann*, 141 F.3d at 295; *Isbell*, 418 F.3d at 796.[23] Summary judgment is granted to United on the ERISA claim.

---

[23] As discussed above, the facts don't show that Bishop rushed the termination decision or failed to accommodate Clapper to prevent her from accessing benefits. The record also doesn't support Clapper's argument that she needed to move her surgery to have it covered under the company's program. *See* [89] ¶ 28. That Telson referenced Medicare in a conversation with Clapper isn't evidence that the company terminated plaintiff with the intent of depriving her of benefits, either. *Hirsch* is distinguishable because that case involved an extensive record of discriminatory intent. *Hirsch for Est. of Hirsch v. Nat'l Mall & Serv., Inc.*, 989 F.Supp. 977, 983–84 (N.D. Ill. 1997).

## IV. Conclusion

Defendant's motion for summary judgment, [77], is granted. Enter judgment and terminate civil case.

ENTER:

October 25, 2022

_____
Manish S. Shah
United States District Judge